## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 09-CV-0192-CVE-TLW** |
| | ) | |
| JERRY D. CRINER, OKLAHOMA | ) | |
| TAX COMMISSION | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action by the United states to obtain a judgment against Jerry Criner for federal income taxes and a judicial determination that legal title to a certain property in Claremore, Oklahoma (hereinafter the Claremore property) was held by Alice Criner as Jerry Criner's nominee; and to foreclose tax liens on Jerry Criner's interest in the Claremore property. The United States has made assessments against Jerry Criner for unpaid income taxes for the years 1990-1993. Alice Criner held legal title to the Claremore property at the time of her death. However, the United States contends that Jerry Criner holds equitable title to the Claremore property and, thus, that its tax lien attached to the Claremore property. The Oklahoma Tax Commission also asserts a tax lien on the Claremore property, and the United States and the Oklahoma Tax Commission seek a declaration of the relative priority of their liens. Jerry Criner contends that the property was his mother's, and that he owns a one-sixth interest therein only. A non-jury trial was held on April 12, 2010. Having

considered the evidence and the submissions of the parties,[1] the Court hereby enters its findings of

fact and conclusions of law.

## I.   FINDINGS OF FACT[2]

## A.   The Parties

1.   Plaintiff is the United States of America.

2.   Defendant Jerry D. Criner is a resident of Claremore, Oklahoma.  Dkt. ## 2, at 2; 7,

at 1.  He currently resides at the Claremore property.  Id.

3.   Defendant Oklahoma Tax Commission (OTC) is an agency of the government of the

State of Oklahoma.  Dkt. ## 20, at 3; 21, at 1.

## B.   Procedural History of the Case

4.   The United States filed a complaint (Dkt. # 2) in this Court on April 8, 2009, listing

Jerry Criner, Virginia McLelland, four unnamed persons, and the OTC as defendants.  The United

States filed an amended complaint (Dkt. # 20) on October 14, 2009, naming Jerry Criner, Barbara

Reeves, Jimmy Criner, Donny Criner, John Criner, the Estate of Virginia McLelland, and the OTC

---

[1]   Although the United States submitted designations of those portions of depositions intended to be offered at trial, see Dkt. ## 36, 38, 44, those designated portions of depositions were neither offered nor admitted into evidence.  "A deposition that has not been offered in evidence is not evidence . . . ."  8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2142 (3d ed.); see also Processteel, Inc. v. Mosley Mach. Co., 421 F.2d 1074, 1075 (6th Cir. 1970) ("[w]e do not . . . approve a practice of using parts of a deposition never offered in evidence"); Times Newspapers Ltd. (of Great Britain) v. McDonnell Douglas Corp., 387 F. Supp. 189, 197 (C.D. Cal. 1974) ("[u]ntil a deposition has been presented to the court (not the Clerk), and ordered opened, it does not become evidence in the case").  Therefore, the Court cannot consider any deposition testimony not admitted at trial, including that of Jerry Criner's former wife, Richelle Criner.

[2]   Any conclusion of law more properly characterized as a finding of fact is incorporated herein.

as defendants.  On March 2, 2010, the United States filed the United States' Motion to Drop Parties or, in the Alternative, for Additional Time to Amend and Serve Complaint (Dkt. ## 37, 39), seeking to dismiss Barbara Reeves, Jimmy Criner, Donny Criner, John Criner, and the Estate of Virginia McLelland.  The Court granted the motion.  Dkt. # 43.  At the pretrial conference, the OTC represented that it was not contesting that the United States' tax lien had priority over its tax lien. The parties agreed that no party was contesting the OTC's tax warrant or the amount of tax liability represented therein.  Dkt. # 53.  The Court excused the OTC from presence at trial and the need to submit proposed findings of fact or conclusions of law.  Id.

C.     **The Claremore Property**

5.     The Claremore property is located at 20154 Carefree Valley Drive, Claremore, Oklahoma 74017.[3,4]  It is located in Rogers County, Oklahoma.  Dkt. # 2, at 4.  It is a 3,100 square-foot home with an attached two-car garage.  Jerry Criner Testimony, Tr. at 175.  It sits on eight acres of land with a pond and a "gazebo" in a somewhat rural area of Oklahoma.  Pl.'s Exs. 48-50; Jerry Criner Testimony, Tr. at 175.

6.     On April 3, 1987, James T. Arnold and Virginia L. Arnold conveyed the Claremore property by warranty deed to Alice Criner.  Pl.'s Ex. 21.  The documentary tax stamp is for the

---

[3]     The trial transcript is Dkt. # 57.  All references to the trial transcript herein will refer to the page number of the transcript and will be in the form: ____ Testimony, Tr. at __.

[4]     The address was previously Rural Route 2, Box 3, or Rural Route 2-3, Claremore, Oklahoma 74017.  Jerry Criner Testimony, Tr. at 137, 184.  The legal description is: Lot 3 in Block 2 of Amended Plat of Carefree Valley, an Addition in Section 8, Township 21 North, Range 17 East of the I.B. & M., Rogers County, Oklahoma, according to the recorded Plat thereof. Pl.'s Ex. 21.

amount of $202.50.  Id.  The Court finds that the purchase price of the Claremore property on April 3, 1987 was $135,000.[5]

**D.  The Criner Family**

7.  Alice Criner's children are Jerry Criner, Barbara Reeves, Johnny Criner, Jr., Donny Criner, Jimmy Criner, and Virginia McLelland.[6]  Johnny Criner Testimony, Tr. at 108.  Virginia is deceased.  Id.  Barbara, Johnny, and Jerry testified at trial.

8.  Barbara Reeves is a resident of Claremore, Oklahoma.  Reeves Testimony, Tr. at 64. Johnny Criner, Jr. is the mayor of Enid, Oklahoma.  Johnny Criner Testimony, Tr. at 107.

9.  Johnny testified that he never paid any money for the upkeep of the Claremore property, nor did he ever discuss having Jerry pay rent to the other siblings.  Johnny Criner Testimony, Tr. at 119-20.  He and Barbara both testified that the children never discussed what to do with the Claremore property after Alice's death.  Id.; Reeves Testimony, Tr. at 84.

10.  Evidence was presented that Virginia McLelland may have lived at the Claremore property for some time while she was experiencing marital problems.  Johnny Criner Testimony, Tr. at 114, 124.  However, no evidence was presented that Virginia lived there alone, or that she lived there for an extended period of time.  See id. at 123-24 (stating that Jerry's wife Richelle Criner may have been in the Claremore property at the same time as Virginia, but that he never visited Virginia there and did not know who was in the house).  Further, no witness could remember the dates during which Virginia may have stayed at the property.

---

[5]  In 1987, Oklahoma imposed a tax on instruments conveying land or other realty at the rate of $0.75 for each $500 of consideration paid.  OKLA. STAT. tit. 68, § 5101 A. (1987).

[6]  Because many of the persons relevant to this case have the same last name, the Court will refer to members of the Criner family by their first names.

4

**E.      Alice Criner**

11.      Alice Criner died in August 1989.  Reeves Testimony, Tr. at 65.  She was survived by her six children.  Id.  Alice and her husband divorced between 1949 and 1960, and Alice never remarried.  Id. at 66.  Alice raised her children by herself.  Id.  She worked in food service at the St. John Medical Center cafeteria in Tulsa, Oklahoma for about thirty years.  Id. at 67; Johnny Criner Testimony, Tr. at 109-110.  She was not a manager.  Reeves Testimony, Tr. at 67.  She did not own an automobile.  Id.  She would take the bus to work or one of her children would drive her.  Id.  Between two and ten years prior to her death, Alice ended her employment with St. John and received disability benefits, which were her sole source of income.  Id. at 68.  Johnny helped his mother apply for these disability benefits.  Johnny Criner Testimony, Tr. at 110.

12.      By about 1966,[7] Alice Criner had sold her home on Independence Street in Tulsa, Oklahoma.  She had to sell the home because it had been broken into a few times and her insurer determined it could no longer carry her as long as she lived in a neighborhood like the one she lived in.  Reeves Testimony, Tr. at 69.  The Court finds that Alice would not have received substantial income from the sale of the Independence Street home.  Alice moved to a rental apartment in Tulsa. Id. at 69.  She moved from that apartment to a second rental apartment in Tulsa.  Id. at 68-69.  She then moved to an apartment in Broken Arrow, Oklahoma and, subsequently, to a nursing home in Broken Arrow.  Id. at 69-70.  She left that nursing home and moved to another rental apartment in

---

[7]      No witness was able to recall with any specificity the dates of Alice's occupancy of various residences.  In fact, Barbara, Johnny, and Jerry each had significant difficulty remembering the dates of events such as moving, marriage or divorce, and the birth of their children.  The Court does not find this inability to remember dates entirely credible.

Broken Arrow, on North Ash Street. Id. at 71. She then moved to a second nursing home in Broken Arrow, where she resided at the time of her death. Id. at 71, 76.

13.     Barbara was the child primarily responsible for taking care of Alice.   Reeves Testimony, Tr. at 75-76, Johnny Criner Testimony, Tr. at 111. Barbara would check in on her at least once a week. Reeves Testimony, Tr. at 75-76. Barbara testified that Alice would go to the Claremore property to visit Richelle Criner, Jerry's third wife. Id. at 73-74. She testified that she did not think that Alice ever lived in the Claremore property alone. Id. at 74. Barbara would have known if Alice had lived at the Claremore property. The Court finds that Alice visited the Claremore property, but never made it her permanent residence.

14.     Barbara helped Alice with her finances. Reeves Testimony, Tr. at 76. When Alice needed assistance, Barbara would write checks for the nursing homes or apartment rent, and for medical expenses. Id. at 77-78. Barbara could write checks on Alice's checking account. Id. at 77. If Alice had any other bank accounts, Barbara was not aware of them. Id. at 78.   No funds in the checking account were used to purchase real estate. Id.   Barbara never made any mortgage payments from that account, nor was she aware of her mother making any. Id.   The checking account became depleted during the last few months of Alice's life. Id. at 79.

15.     At trial, Jerry insinuated that Alice might have saved enough money to purchase the Claremore property because Alice was "frugal." Tr. at 98, 124. No amount of frugality would have enabled Alice to purchase a home for $135,000 and rent an apartment at the same time when her sole sources of income were her food service job at St. John and/or disability payments. Barbara testified that she was not aware of any mortgage payments made by Alice Criner. Reeves Testimony, Tr. at 78. At her deposition, when Barbara was asked whether any of her siblings told her where the funds

6

to purchase the Claremore property came from, she replied "I think only Jerry and mother would know that." Reeves Testimony, Tr. at 96. Further, Johnny did not think his mother would have had the means to purchase property for $135,000 in 1987. Johnny Criner Testimony, Tr. at 120. The Court finds that Alice did not have the financial means to purchase a home for $135,000 (whether in cash or through a loan) in April1987.

16.     The only evidence tending to show that Alice was even aware that the Claremore property was titled in her name is an appearance bond for Jerry Criner, signed by Alice Criner as a surety. Pl.'s Ex. 22. The bond was signed May 28, 1987. Id. Alice's address is listed as 210 N. Ash Street, which was her second rental apartment in Broken Arrow. Id.; Reeves Testimony, Tr. at 73. The Qualification of Surety states that Alice is the record title owner of the Claremore property and pledges it as surety for the appearance bond. Pl.'s Ex. 22. The identifying witness to the bond was William "Red" Thornton, a member of Jerry Criner's slot cheating "crew." Id.; Jerry Criner Testimony, Tr. at 146.

17.     The Court finds that the appearance bond is not evidence that Alice paid for or lived in the Claremore property. There is no evidence that Alice knew or understood what she was signing. The Court does not find Barbara's statement that Alice would not have signed the bond if she did not own the property particularly credible or probative. Reeves Testimony, Tr. at 103. Johnny testified that Alice had "a weak eye" when it came to Jerry. Johnny Criner Testimony, Tr. at 120. At her deposition, Barbara testified that Alice and Jerry "had affairs that [Barbara] was not aware of" and that Alice "was taking care of my brother's affairs or something like that . . . ." Reeves Testimony, Tr. at 90. Thornton's presence and the fact that the bond was for Jerry suggests that Alice was pressured to sign the bond or given an inaccurate explanation of what the bond was.

7

Regardless of why Alice signed the bond or what she was thinking when she signed it, the bond is not evidence that Alice paid for, occupied, or otherwise used the Claremore property.

18.     There is no other evidence tending to show that Alice Criner paid for or lived in the Claremore property.  Alice never mentioned purchasing any property or maintaining any property to Barbara, Reeves Testimony, Tr. at 91-93, or to Johnny, Johnny Criner Testimony, Tr. at 117. When Alice died, Barbara did not think that Alice owned the house.  Reeves Testimony, Tr. at 83. Barbara was surprised to learn that title to the Claremore property was in Alice's name.  Id. at 85. At her deposition, Barbara testified that "only Jerry and mother would know" where the proceeds for the purchase of the Claremore property came from.  Id. at 95-96.  At the time of Alice's death, Johnny thought Jerry owned the Claremore property, because Jerry and his wife and children were living there. Johnny Criner Testimony, Tr. at 118.   Although Barbara testified that her mother was a very private person, Reeves Testimony, Tr. at 91, the Court finds it highly implausible that Alice Criner would have owned property of which Barbara Reeves and Johnny Criner were unaware. Further, Johnny and Barbara both believed that Jerry had something to do with the Claremore property.

19.     Alice Criner died intestate.  Reeves Testimony, Tr. at 84.  After her death, the proceeds of her life insurance policy were paid to Barbara.  Id.  Barbara used the proceeds to pay for the burial plot and taxes, and then divided the remainder equally among the Criner children.  Id. Each child received about $1,400 from the policy proceeds.  Johnny Criner Testimony, Tr. at 126. This was the only inheritance Alice's children received.  Id.

20.     The Court finds that Alice Criner did not provide the funds to purchase the Claremore property on April 3, 1987.  The Court further finds that Alice Criner never lived at the Claremore

8

property, made improvements to the Claremore property, or otherwise made use of the Claremore property.

**F.     Jerry Criner**

21.     Jerry Criner currently lives at the Claremore property.  Jerry Criner Testimony, Tr. at 127.  He denied providing the funds to purchase the Claremore property, and stated that he does not know who provided them.  Id. at 137.  Jerry testified that, except for his time in prison and the two years he spent at a property on Marshall Street in Tulsa, Oklahoma, the Claremore property has been his primary residence since 1990.[8]  Id. at 174.  Jerry admitted that he paid to have a pond and fence installed on the property and to have the roof replaced.  Id. at 175, 177.  He testified that, for the past twenty years, he has paid real estate taxes and paid for upkeep of the Claremore property. Jerry Criner Testimony, Tr. at 177-78.  He testified that Virginia also paid taxes and for upkeep while she was living at the property.  Id.  However, Virginia lived at the property for two years, at most.  Id.

22.     Jerry maintains that his siblings all have equal shares in the Claremore property. Jerry Criner Testimony, Tr. at 180.  He has never offered to buy out his siblings' shares, has never offered to pay them any rent, and has never discussed probating his mother's estate with his siblings. Id.

i.     Jerry Criner's Income and Tax Returns

23.     From the mid-1980s or earlier and through 2000, Jerry made most of his income by cheating slot machines.  Jerry Criner Testimony, Tr. at 131-134.  He used mechanical and optical

---

[8]     However, he also testified that he had been planning to move to the Claremore property by August 1989, and that his wife Richelle may have moved there even earlier.  Barbara and Johnny testified that Richelle lived there prior to August 1989.  See ¶ I.35, infra.

devices to fool or disable the payout switches on electronic slot machines.  Jerry Criner Testimony, Tr. at 131.  He often worked with a two-person "crew," Mary Tiger and William "Red" Thornton, who employed diversionary tactics to avoid detection by casino authorities.  Lindsay Testimony, Tr. at 10; see also Jerry Criner Testimony, Tr. at 195-96; Tiger Testimony, Tr. at 205.

24.     Jerry admits that he did not file federal income tax returns between the years 1990 and 1994.  Jerry Criner Testimony, Tr. at 128.  Although Jerry could not estimate the amount of money he made from casino cheating, the Court finds that this income was substantial.  He was able to purchase real estate, a trucking business, "nice" homes, Lincoln Town Cars, and take vacations with his cheating income.  Jerry Criner Testimony, Tr. at 135-36.  In 1998, the unpaid balance of the Internal Revenue Service's assessments (including interest and penalties) for unpaid income taxes for the years 1990, 1991, 1992, and 1994[9] totaled $70,307.58.[10]  Pl.'s Ex. 44.

25.     In the mid-1980s, Jerry formed a corporation, the Wesley Brown Society (WBS), to hide his casino cheating income from taxing authorities.  The name was chosen because it sounded vaguely religious.  Jerry Criner Testimony, Tr. at 158.  He admitted that WBS did not engage in any corporate formalities, and that he used WBS funds to pay his own expenses.  Id. at 159-60.  WBS never filed tax returns.  Id. at 167.  Jerry's properties in Reno, Nevada, on Marshall Street in Tulsa, Oklahoma, on 47th Place in Tulsa, and in the Willow Creek Condominiums in Tulsa were each titled in WBS's name.  Id. at 158, 164, 166.  Jerry's trucking business, see infra, was owned by WBS.  Id.

---

[9]     See n. 11, infra.

[10]    Assuming that a portion of this total is interest and penalties, and without attempting to actually calculate the amount of income the assessments represent, these assessments make it clear that the Internal Revenue Service believed that Jerry had significant income between 1990 and 1994.

at 157.  At least one of his Lincoln Town Cars was owned by WBS.  Id. at 157, 159.  The source of the funds for all of these purchases was casino cheating income.  Id. at 157-66.

26.     Jerry also attempted to hide his casino cheating income by placing it in securities accounts in his children's names.  Jerry Criner Testimony, Tr. at 168.   He admits that he used the funds in these accounts to pay his own expenses, including attorney fees and Internal Revenue Service fines.  Id. at 169.  Over time, the amount of money in these accounts dropped from over $300,000 to zero.  Id. at 169-70.  None of this money went to his children.  Id. at 170.

27.     The Court finds that Jerry Criner is not a credible witness.  Jerry has engaged in a persistent pattern of dishonest behavior for over twenty years.  He has made numerous attempts to hide his income from tax authorities.  His testimony at trial was not credible.  He was able to recall minute details of certain irrelevant events, for example: a detailed story about buying his mother a television, Tr. at 194-95, but denied or did not remember significant events testified to by other, credible witnesses, for example: his being questioned by a New Jersey police officer, see ¶ ¶ I. 37-39, infra.  Further, Jerry was unable to remember the dates of significant life events, for example: when he purchased properties, see, e.g., Tr. at 85, or was divorced, see Tr. at 133.  The Court does not find credible Jerry Criner's inability to remember even approximate dates.  He could remember details that were advantageous for him to remember, and could not remember details that did not work to his benefit.

ii.     Activities During the 1980s

28.     In the mid-1980s, Jerry lived at 120 Drew Drive, Reno, Nevada, with his third wife, Richelle.  Jerry Criner Testimony, Tr. at 144-45.  During that time, his primary source of income was cheating slot machines.  Title to the Reno residence was, at some time, transferred from Jerry

to WBS.  Id. at 158.  In early 1987, Jerry became aware that Nevada authorities were looking for him.  Id. at 146-47.  Based on this belief, Jerry traveled from Nevada to California to Oklahoma in an effort to evade authorities.  Id. at 146.  By May 1987, he had arrived in Oklahoma and was occupying an apartment near the corner of 67th Street and Memorial Drive in Tulsa.  Id. at 138.  The Court finds, however, that this apartment was not a permanent residence.  Jerry testified that his wife and children still lived in Reno, Nevada.  Id. at 144.  When he was arrested in May 1987, see ¶ I. 29, infra, Jerry gave the Reno, Nevada property as his address.  Id. at 142.  The Court finds that Jerry took up temporary residence in Tulsa in or before May 1987.  When Jerry arrived in Tulsa, Red Thornton met him at the airport.  Jerry Criner Testimony, Tr. at 189.  Jerry stated that he did not go to visit his mother when he arrived in Tulsa because he "did not want to get her involved." Id. at 190.

29.     In May 1987, Jerry was arrested in Tulsa on a Nevada Gaming Commission warrant for cheating slot machines in Nevada.  Id. at 137-38.  He admits to having a $37,000 cashier's check on his person at the time he was arrested.  Id. at 141.  He denies having $65,000 in cash on him at the time he was arrested, but admits that the booking clerk wrote down that he had $67,000 cash on him.  Id. at 140.  The Court does not find Jerry Criner's denial credible.  Jerry later went to court in an attempt to retrieve this $65,000 or $67,000.  Id. at 141-42.

30.     Two weeks after his arrest, an appearance bond was posted, with Alice pledging the Claremore property as security.  See ¶ I. 16, supra; Jerry Criner Testimony, Tr. at 143.

31.     After his arrest and prior to his trial, Jerry set up a trucking business, U-Pack and Save, in Oklahoma.  Jerry Criner Testimony, Tr. at 148-49.  He stated that he did this in the hope of minimizing his potential prison sentence.  Id. at 148.  At trial, Jerry testified that the business took

12

1-2 months to set up. <u>Id.</u> at 149. At his deposition, he testified that it took a year to set up. <u>Id.</u> at 151. Jerry testified that he stayed in Tulsa for two to three months after his release from jail. <u>Id.</u> at 147. However, he also testified that while he was awaiting trial, he was in Oklahoma once only: when he moved a truck from Reno to Oklahoma. <u>Id.</u> at 150. The Court does not find Jerry's testimony on this matter credible.

32.     The funds used to purchase trucks and set up the business were derived from casino cheating. <u>Id.</u> at 167. The trucking business was in WBS's name. <u>Id.</u> at 157, 167.

33.     Jerry used the Claremore property as the address for the trucking company and had a telephone line for the company at the Claremore property. Jerry Criner Testimony, Tr. at 152. The Court finds that Jerry was using the Claremore property as early as May-June, 1987.

34.     The Court finds that Jerry Criner had the means to purchase a property for $135,000 in April 1987. At trial, Jerry testified that he had significant expenses around the time of April 3, 1987, and that he would not have had the means to purchase a home for his mother at the time. Jerry Criner Testimony, Tr. at 188. However, many of the expenses cited by Jerry were incurred <u>after</u> his arrest in May 1987, for example: attorney fees and the trucking business. The existence of these post-arrest expenses does show that Jerry could not have purchased the Claremore property prior to his arrest. The fact that Jerry paid these expenses shows that he had a significant amount of money at the time he was arrested. In May 1987, Jerry had recently engaged in casino cheating, was arrested with a significant amount of money on his person, and, immediately following his arrest, spent significant casino cheating income on setting up a trucking business. The Court finds that Jerry Criner had the means to purchase the Claremore property on April 3, 1987.

35.     Jerry spent approximately seventeen months in prison in Nevada, from March 1988 to August 1989.  Jerry Criner Testimony, Tr. at 152-53.  He was released a few days early in order to attend Alice's funeral.  Id. at 152.  He testified that he began planning to move to the Claremore property prior to his release from prison.  Id. at 154.  He testified that Richelle might have moved to the Claremore property prior to his release.  Id.  Johnny testified that Richelle lived at the Claremore property prior to Alice's death.  Johnny Criner Testimony, Tr. at 112, 114.  He further testified that Jerry moved to the Claremore property when he got out of prison.  Id.  Barbara testified that, during the last few years of her mother's life, Jerry was at the Claremore property when Barbara would visit him.  Reeves Testimony, Tr. at 81.  The only time when Jerry could have been at the Claremore property while Alice was still alive was prior to his incarceration in March 1988. Barbara further testified that she and Alice would visit Richelle at the Claremore property.  Id. at 73-74, 82.  The Court finds that Richelle lived at the Claremore property while Jerry was incarcerated and prior to Alice's death.  The Court further finds that Jerry Criner moved to the Claremore property upon his release from prison in August 1989, and had made use of the Claremore property prior to his incarceration.

iii.     Activities During the 1990s

36.     On August 12, 1993, Jerry was arrested in Atlantic City, New Jersey for casino cheating.  Lindsay Testimony, Tr. at 27, 39; Jerry Criner Testimony, Tr. at 196.  Also in August 1993, Jerry caused WBS to purchase a property on Marshall Street in Tulsa, Oklahoma for $85,000. Jerry Criner Testimony, Tr. at 162.  At his deposition, Jerry testified that Atlantic City paid for the Marshall Street property.  At trial, he admitted that casino cheating proceeds paid for the Marshall

14

Street property. Id. The Marshall Street property was purchased with cashier's checks, admittedly in order to deceive the Internal Revenue Service. Id. at 163.

37.     Captain Richard Lindsay of the New Jersey State Police Casino Gaming Bureau investigated Jerry's cheating activities.   From August 7-11, 1993, Lindsay was in Claremore investigating Jerry.  Lindsay Testimony, Tr. at 8.  In connection with his investigation, Lindsay contacted Internal Revenue Service agent John Thomas regarding Criner and "turned the light on for him as far as cheating and things like that that occurred in the Oklahoma area." Id. at 9.  Lindsay testified that Thomas was not previously aware of Jerry, but was interested in how Jerry's income was derived.  Id.

38.     Based on information from the Claremore Chief of Police, a confidential police informant, and a travel agent who made reservations for Jerry and his crew, Lindsay drove by the Claremore property based on the belief that it was Jerry's residence.  Lindsay Testimony, Tr. at 18-19, 41-42, 48.  Lindsay left Claremore because Tiger and Thornton booked a flight to Atlantic City. Id. at 10.  In fact, Lindsay and other law enforcement officers traveled from Tulsa to Atlantic City on the same flight as Tiger and Thornton.  Id. at 11.  Lindsay and other officers observed Jerry and his crew engage in slot machine cheating at several casinos in Atlantic City.  Id.   Jerry Criner, Tiger, and Thornton were arrested.  Id. at 13.

39.     Lindsay testified that he interviewed Jerry after his arrest.  Lindsay Testimony, Tr. at 12.  He testified that Jerry provided information regarding how he cheated slot machines and how he operated his business.  Lindsay also testified that Jerry told him that he bought the Claremore property for his mother, and that the house was in probate and he was trying to get it out so that it could be sold.  Id. at 21. Lindsay's memorandum describing the interview lists Jerry's address as

15

that of the Claremore property, with two digits in the zip code transposed.  Pl.'s Ex. 20, at 1.  Jerry denies ever speaking to Lindsay.  Jerry Criner Testimony, Tr. at 128.

40.     The Court finds Lindsay's testimony highly credible.  Lindsay had reason to remember the interview well because it was unique: it was the first optic light cheating arrest in Atlantic City, and it was the first time that Lindsay had followed a suspect from Oklahoma to Atlantic City.  Lindsay Testimony, Tr. at 22-23. Lindsay was forthright about the details that he could and could not remember.  Lindsay's testimony was consistent with the memorandum he wrote on August 16, 1993.  Pl.'s Ex. 20.  Lindsay would have no reason to fabricate an admission by Jerry that he purchased the Claremore property for his mother, as Lindsay was not involved in any tax-related investigations or proceedings.  Lindsay included this information in a memorandum to Internal Revenue Service agent Thomas because he thought Thomas might be interested in it.  Lindsay Testimony, Tr. at 33-34.  Further, Lindsay's account of the interview included information about Jerry running a jewelry business out of his home.  Id. at 19-20.  Although Jerry stated that he was "not actively selling jewelry" in 1993, he did not deny the existence of some sort of jewelry business.  Jerry Criner Testimony, Tr. at 128.  Lindsay would have no reason to know of Jerry's jewelry-related activities, other than Jerry telling Lindsay about them.

41.     Jerry attempted to impeach Lindsay's testimony by questioning why the conversation was not recorded.  Tr. at 35-36.  The Court finds nothing suspicious about the failure to record the conversation or have Jerry sign a written confession.  The discussion between Lindsay and Jerry Criner was an informal interview; Lindsay did not believe that Jerry made any sort of formal confession during the interview.  See Lindsay Testimony, Tr. at 57-58.  Therefore, the fact that procedures associated with formal confessions were not followed is irrelevant.  The Court finds

16

Jerry's denial of the interview not credible.  The Court further finds that Jerry told Lindsay that he purchased the Claremore property for his mother.

42.     Jerry Criner testified that, when he learned that his mother's name was on a deed to a property in Claremore, his reaction was incredulous:  "where's Claremore?"  Jerry Criner Testimony, Tr. at 191.  The Court does not find this testimony credible.  It contradicts Jerry's own testimony that he was planning to move to the Claremore property before he was released from prison and prior to his mother's death.  Id. at 154.  Jerry also testified that he was sure he had spent the night at the Claremore property prior to 1989.  Id. at 153-54.  The only time during which Jerry could have spent the night at the Claremore property prior to 1989 was before he was incarcerated in March 1988.  Alice was alive during this time, but did not live at the Claremore property.

43.     Jerry admitted that he used the Claremore property's address and telephone for his trucking business, which he set up in May - August 1987.  Jerry did not explain who he thought owned the property while he was using it to set up his business, or, in fact, while he lived there prior to learning it was titled in his mother's name.  The Court finds it implausible that Jerry would live in a home or use a home as a business address without knowing who owned it.

44.     The purchase of the Claremore property using Alice Criner's name is consistent with Jerry's pattern of purchasing properties in a name other than his own in order to disguise casino cheating income.  Since the mid-1980s, each of Jerry Criner's primary residences has been titled in a name other than his own.  The Reno, Nevada property was titled in WBS's name.  The Claremore property is titled in Alice Criner's name.  The Marshall Street property was titled in WBS's name. Jerry Criner Testimony, Tr. at 181-82.

17

45.     Further, the purchase of the Claremore property in Alice Criner's name while running from authorities in 1987 is consistent with Jerry's actions in 1993.  Within a month of his Atlantic City arrest, Jerry caused the Marshall Street property to be purchased with his Atlantic City cheating income and titled in WBS's name, admittedly in order to deceive the Internal Revenue Service.  The Claremore property was purchased one month before Jerry's May 1987 arrest for casino cheating, and while Jerry knew that Nevada authorities were after him.  Criner traveled to Oklahoma prior to his arrest, around the time that the Claremore property was purchased.

46.     Based on the foregoing evidence, the Court finds that Jerry Criner provided the funds to purchase the Claremore property in 1987 and caused the property to be titled in Alice Criner's name.  He did this in order to disguise casino cheating income in anticipation of his possible arrest and to avoid tax liabilities.

**G.     The United States' Tax Lien**

47.     On September 9, 1996, the United States assessed and gave notice and demand for payment upon Jerry Criner for federal income taxes and additions to taxes for the years 1990, 1991, 1992, and 1993.[11]  Pretrial Order, Dkt. # 52, at 2.

---

[11]     The Amended Complaint (Dkt. # 20) does not mention tax liability for 1994.  The Pretrial Order (Dkt. # 52) does not mention tax liability for 1994.  However, the United States' proposed Findings of Fact and Conclusions of Law state that the United States is entitled to judgment against Jerry in the amount of $266,562.76 plus interest and penalties for unpaid taxes for the years "1990, 1991, 1993, 1994."  Dkt. # 59, at 13.  The Court assumes that the omission of 1992 and the inclusion of 1994 are typographical errors.

48.     On July 8, 1998, the United States filed a Notice of Federal Tax Lien against Jerry Criner for unpaid taxes for the years 1990, 1991, 1992, and 1994[12] with the County Clerk of Rogers County, Oklahoma.  Pl.'s Ex. 44.

49.     On March 29, 2001, the United States filed a Notice of Federal Tax Lien against Jerry Criner for unpaid taxes for the year 1993 with the County Clerk of Rogers County, Oklahoma.  Pl.'s Ex. 43.

50.     On January 17, 2002, the United States filed a Notice of Federal Tax Lien against Alice Criner as the Nominee of Jerry D. Criner for unpaid taxes for the years 1990-1993 with the County Clerk of Rogers County, Oklahoma.  Pl.'s Ex. 41.  On January 31, 2002, the United States filed a correction to the January 17, 2002 notice.  Pl.'s Ex. 40.  The January 31, 2002 notice states that the United States claims an interest in the Claremore property.  Id.

51.     On April 7, 2006, the United States filed a Notice of Federal Tax Lien against Alice Criner as the Nominee of Jerry D Criner for unpaid taxes for the years 1991-1993 with the County Clerk of Rogers County, Oklahoma.  Pl.'s Ex. 39.

52.     On May 15, 2007, the United States filed a Notice of Federal Tax Lien against Jerry Criner for unpaid taxes for the years 1991-1993 with the County Clerk of Rogers County, Oklahoma.  Pl.'s Ex. 42.

53.     As of March 1, 2010, the unpaid income taxes and statutory additions owed by Jerry Criner for the tax years 1990-1993 were:

---

[12]     This notice includes tax liability for 1994. However, the Amended Complaint (Dkt. # 20) and Pretrial Order (Dkt. # 52) relate to Jerry Criner's tax liability for the years 1990, 1991, 1992, and 1993 only.

- 1990: zero
- 1991: $12,612.25
- 1992: $77,998.77
- 1993: $175,951.74

Pretrial Order, Dkt. # 52, at 2.  The total is $266,562.76.

**H.     The OTC's Tax Lien**

54.     On May 6, 2009, the OTC issued tax warrant No. ITI 2000 00687 00 for Jerry

Criner's unpaid state taxes.  Dkt. # 5-2, at 1.  The total taxes, interest, and penalties due was

$36,505.11.  Id.

**II.    CONCLUSIONS OF LAW[13]**

**A.     Jurisdiction and Venue**

1.     The federal district courts have original jurisdiction of any civil action arising under

any Act of Congress providing for internal revenue, 28 U.S.C. 1340, and to "render such judgments

and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws,"

26 U.S.C. § 7402.  The United States Attorney General or his delegate may request a civil action to

be filed in a district court to enforce a United States tax lien, after which the court shall "proceed

to adjudicate all matters involved therein and finally determine the merits of all claims to and liens

upon the property, and, in all cases where a claim or interest of the United States therein is

established, may decree a sale of such property, by the proper officer of the court, and a distribution

of the proceeds of such sale according to the findings of the court in respect to the interests of the

parties and of the United States."  26 U.S.C. § 7403(c).

---

[13]     Any finding of fact more appropriately characterized as a conclusion of law is incorporated
herein.

2.      This Court has subject matter jurisdiction over this matter because it is an action to enforce a United States tax lien and to adjudicate related matters necessary and appropriate to the enforcement of the internal revenue laws.

3.      In a civil action not based solely on diversity jurisdiction, venue is proper in a judicial district where any defendant resides or where a substantial part of the property that is the subject of the action is situated.  28 U.S.C. § 1391(b).  In a civil action for the collection of internal revenue taxes, venue is proper in the district of the taxpayer's residence.  28 U.S.C. § 1396.

4.      Venue is proper in this district because Jerry Criner resides in the Northern District of Oklahoma and the Claremore property is located in the Northern District of Oklahoma.[14]

**B.      Federal Tax Liens**

5.      A federal tax lien arises upon assessment.  26 U.S.C. §§ 6321, 6322.  Federal tax liens attach to all property and rights to property of the debtor.  26 U.S.C. § 6321.  Property and rights to property may include

> 'not only property and rights to property owned by the taxpayer but also property held by a third party if it is determined that the third party is holding the property as a nominee . . . of the delinquent taxpayer.'  The nominee theory focuses upon the taxpayer's relationship to a particular piece of property. The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership.

Holman v. United States, 505 F.3d 1060, 1065 (10th Cir. 2007) (quoting Spotts v. United States, 429 F.3d 248, 251 (6th Cir. 2005)) (internal citations omitted).

6.      It is undisputed that, on September 9, 1996, the United states assessed and gave notice and demand for payment upon Jerry Criner for federal income taxes and additions for the tax

---

[14]      Rogers County is in the Northern District of Oklahoma.  28 U.S.C. § 116(a).

years 1990-1993.  See ¶ I. 47, supra.  Therefore, a federal tax lien attached to all Jerry's property and rights to property on September 9, 1996.

7.      The question is whether the Claremore property is Jerry Criner's property or rights to property, despite Alice's legal title.  "[A]n actual transfer of legal title is not essential to the imposition of a nominee lien. A delinquent taxpayer who has never held legal title to a piece of property but who transfers money to a third party and directs the third party to purchase property and place legal title in the third party's name may well enjoy the same benefits of ownership of the property as a taxpayer who has held legal title." Holman, 505 F.3d at 1065.  The nominee doctrine is a question of both state and federal law.  First, the court must determine whether the taxpayer has any rights in the property under state law.  Id. at 1067 (citing Drye v. United States, 528 U.S. 49, 55 (1999)).  Second, "[i]f the court concludes that the taxpayer has a property interest under state law, then 'federal law . . . determine[s] whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of federal tax lien legislation.'" Id. (quoting Drye, 528 U.S. at 58).[15]

---

[15]      In his proposed findings of fact and conclusions of law (Dkt. # 58), Jerry Criner argues that the legal standard governing this case is the six-factor test described in Richards v. United States, 231 B.R. 571 (Bankr. E.D. Pa. 1999).  He makes the unsupported assertion that "[t]hese factors have been adopted in dozens of other federal cases since then." Dkt. # 58, at 2.  Although some of these factors may be relevant to the state law inquiry, there is no authority to suggest that  these factors supplant the state law inquiry required by Holman, 505 F.3d 1060, and Drye, 528 U.S. 49.  Further, the Richards court stated that "the critical consideration is whether the taxpayer exercised active or substantial control over the property." 231 B.R. at 579.  This consideration is also relevant under Oklahoma law.  See ¶ II. 8, infra.  The result in this case would be the same under the Richards analysis.

C.      **Oklahoma Law Regarding Equitable Title to Property**

8.      Under Oklahoma law, "the holder of equitable title to [property] is regarded in law as the owner thereof."  In re Assessments for Year 2005 of Certain Real Property Owned by Askins Properties, L.L.C., 161 P.3d 303, 311 (Okla. 2007) (citing Bowls v. Oklahoma City, 104 P. 902 (Okla. 1909)).  Equitable title can exist in someone other than the holder of legal title in a number of ways.  The party asserting that equitable and legal title have been severed has the burden of proof by "evidence that is clear, unequivocal, and decisive."[16]  Catron v. First Nat'l Bank & Trust Co. of Tulsa, 434 P.2d 263, 268 (Okla. 1967) (discussing the burden of proof for establishing a resulting trust).   A resulting trust arises by operation of law where  "the intent appears or is inferred from . . . accompanying facts and circumstances [ ] that the beneficial interest is not to . . . go or be enjoyed with the legal title."  Cacy v. Cacy, 619 P.2d 200, 202 (Okla. 1980).  "[W]hen a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."  OKLA. STAT. tit. 60, § 137; see also Boatright v. Perkins, 894 P.2d 1091, 1094 (Okla. 1995) ("[w]hen legal title to real property is conveyed to one and another pays the consideration, the law presumes that the latter person (who paid the purchase price) intended to acquire the equitable interest in the property").  Other relevant circumstances include:  whether a confidential or fiduciary relationship existed between the legal and purported equitable owner,[17] Wadsworth v. Courtney, 393 P.2d 530, 533

---

[16]     A resulting trust may be established by parol evidence.  Pesgrove v. Robbins, 451 P.2d 961, 962 (Okla. 1969).  A mere conflict in witnesses' testimony does not render evidence unclear or indecisive.  Barry v. Frizzell, 371 P.2d 460, 464 (Okla. 1962).

[17]     "The relationship of parent and child does not of itself create a confidential or fiduciary relation between the parties . . . ."  Wadsworth v. Courtney, 393 P.2d 530, 533 (Okla. 1964).

23

(Okla. 1964), the means of payment of the consideration for the property, <u>Barry v. Frizzell</u>, 371 P.2d 460, 464 (Okla. 1962), and whether the purported equitable owner controlled, occupied, or made improvements on the premises, <u>Pearson v. Mullins</u>, 369 P.2d 825, 826-27 (Okla. 1962); <u>Fibikowski v. Fibikowski</u>, 94 P.2d 921, 923 (Okla. 1939); <u>Irvin v. Thompson</u>, 464 P.2d 775, 775 (Okla. Ct. App. 1969).

9.      In <u>Holman</u>, the Tenth Circuit identified six factors that courts commonly use in evaluating nominee questions:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

<u>Holman</u>, 505 F.3d at 1065 n.1 (quoting <u>Spotts</u>, 429 F.3d at 251).  Although not specific to Oklahoma law, the <u>Holman</u> factors provide additional circumstances from which it may be inferred that "the beneficial interest is not to . . . go or be enjoyed with the legal title."  <u>Cacy</u>, 619 P.2d at 202.

10.      The United States has proved by evidence that is clear, unequivocal, and decisive that equitable and legal title to the Claremore property were severed, and that Jerry Criner holds equitable title.   Alice Criner never lived at the Claremore property, nor did she make any improvements to the Claremore property.  She went to the Claremore property to visit Jerry's wife, who lived there while Alice was alive.  Jerry set up a business using the Claremore property as his address in May - August 1987, while his mother was alive and very soon after the property was purchased.  Jerry moved to the Claremore property upon his release from prison in 1989 and has occupied it since, with the exception of time spent in prison and two years spent at the Marshall Street property.  Jerry has made improvements to the Claremore property and has paid property

24

taxes for the Claremore property.  None of the Criner children has ever attempted to probate Alice's estate, nor has any child demanded rent or compensation from Jerry for his occupation of the property.  Jerry's siblings treated the Claremore property as if it were owned by Jerry.

11.     Further, Jerry Criner paid the consideration for the Claremore property.  Pursuant to OKLA. STAT. tit. 60, § 137, a trust is presumed to result in Jerry's favor.  He has failed to rebut this presumption because he provided no evidence that Alice ever occupied or used the Claremore property, and the evidence shows that Jerry consistently treated the property as his own.

12.     Additionally, application of the Holman factors supports the conclusion that Alice Criner held legal title to the Claremore property as Jerry Criner's nominee.  See Holman, 505 F.3d at 1065 n.1  Alice did not pay the consideration for the Claremore property; the property was placed in Alice's name in an effort to hide Jerry's casino cheating income from authorities; Alice was never in possession of the Claremore property and Jerry and Richelle Criner came into possession of the property soon after the sale; and Jerry Criner enjoyed the benefits of the Claremore property while Alice was alive and continues to do so today.

13.     Therefore, Jerry Criner holds equitable title to the Claremore property under Oklahoma law.

**D.      Federal Law Regarding Equitable Interests in Property**

14.     It is widely accepted that an equitable interest in property is "property or rights to property" under 26 U.S.C. § 6321.  See Holman, 505 F.3d at 1065; see also Orme v. United States, 269 F.3d 991, 994 (9th Cir. 2001); In re Orr, 180 F.3d 656, 662 (5th Cir. 1999); Drye Family 1995 Trust v. United States, 152 F.3d 892, 895 (8th Cir. 1998) aff'd 528 U.S. 49 (1999) ; United States v. Miller Bros. Constr. Co., 505 F.2d 1031, 1036 (10th Cir. 1974).

15.     The Claremore property is Jerry's "property or rights to property" under federal law. Therefore, the Claremore property is subject to the United States' tax lien.

**E.      Priority of State and Federal Tax Liens**

16.     "Federal law governs the relative priority of federal tax liens and state-created liens." Aquilino v. United States, 363 U.S. 509, 514 n.5 (1960).  Absent federal law to the contrary, the priority of state and federal liens depends "on the time it attached to the property in question and became choate."  United States v. City of New Britain, 347 U.S. 81, 86 (1954).  A lien is choate when "the identity of the lienor, the property subject to the lien, and the amount of the lien are established."  Id. at 84; see also United States v. Vermont, 377 U.S. 351, 358 (1964) (applying the New Britain test to a state's lien).

17.     Federal tax liens arise at the time the assessment is made.  26 U.S.C. §§ 6321, 6322.  Thus, a federal tax lien is generally choate at the date the assessment is made.[18]  See United States v. Leventhal, 316 F.2d 341, 343 (D.C. Cir. 1963) (a lien arising under §§ 6321 and 6322 "was valid as of [the date of assessment] against all persons except mortgagees, pledgees, purchasers, and judgment creditors").

18.     Under Oklahoma law, tax liens arise at the time a tax warrant is issued and filed under OKLA. STAT. tit. 68, § 231, or at the date taxes are due and payable, see OKLA. STAT. tit. 68, § 234.  Thus, for the purposes of this case, Oklahoma state taxes are choate as of the date a tax warrant is issued.

---

[18]     28 U.S.C. § 6323 requires that notice of the lien be filed in order to be valid against mortgagees, pledgees, purchasers, and judgment creditors.  Notice to third parties is not an issue in this case.

19.     It is undisputed that the federal tax lien became choate before the OTC's tax lien in this case.  Therefore, the federal tax lien has priority over the OTC's.

**IT IS THEREFORE ORDERED** that, in accordance with these Findings of Fact and Conclusions of Law, a judgment shall be entered as follows:

The United States is entitled to judgment against Jerry Criner in the amount of $266,562.76 plus interest and penalties accruing after March 1, 2010 for unpaid taxes for the years 1990, 1991, 1992, and 1993.

The United States has a valid tax lien for unpaid income taxes for the years 1990, 1991, 1992, and 1993 on all property and rights to property of Jerry Criner.

The Claremore property is Jerry Criner's property or rights to property and is subject to the United States' tax lien, which attached to the Claremore property on September 9, 1996.

The United States' tax lien on the Claremore property has priority over the OTC's tax lien on the Claremore property.

**IT IS FURTHER ORDERED** that the United States may take appropriate action to foreclose its tax lien on the Claremore property.

**DATED** this 13th day of May, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT